## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SHERRY LYNNE HARP,

      Plaintiff,

      vs.                                CIV No. 1:21-0275 KRS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court upon Plaintiff Sherry Lynne Harp's ("Plaintiff's")

Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 18), dated

November 3, 2021, challenging the determination of the Commissioner of the Social Security

Administration ("SSA") that she is not entitled to disability benefits under Title II and Title XVI

of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Commissioner responded to

Plaintiff's Motion on January 25, 2022 (Doc. 22), and Plaintiff filed a reply brief on February 16,

2022 (Doc. 23). With the consent of the parties to conduct dispositive proceedings in this matter,

*see* 28 U.S.C. § 636(c); FED. R. CIV. P. 73(b), the Court has considered the parties' filings and

has thoroughly reviewed the administrative record. Having done so, the Court concludes that the

ALJ erred in his decision and will therefore GRANT Plaintiff's Motion and remand this case

back to the SSA for proceedings consistent with this opinion.

### I. PROCEDURAL POSTURE

On September 10, 2018, Plaintiff filed an initial application for disability insurance

benefits and supplemental security income. (*See* Administrative Record ("AR") at 218-27).

Plaintiff alleged that she became disabled on August 1, 2017. (*Id.* at 218-27). Plaintiff's

application was denied at the initial level (*id.* at 48-72), and at the reconsideration level (*id.* at 75-106). Plaintiff requested a hearing (*id.* at 158-60), which ALJ Michael Leppala conducted on March 26, 2020 (see *id.* at 107-25). Plaintiff was represented by counsel and testified at the hearing (*id.* at 8-45), as did vocational expert Leslie J. White (the "VE") (*id.*).

On April 22, 2020, the ALJ issued his decision, finding that Plaintiff was not disabled under the relevant sections of the Social Security Act. (*Id.* at 110-20). Plaintiff requested that the Appeals Council review the ALJ's decision (*id.* at 144), and on January 7, 2021, the Appeals Council denied the request for review (*id.* at 126-31), which made the ALJ's decision the final decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). On March 26, 2021, Plaintiff filed the complaint in this case seeking review of the Commissioner's decision. (Doc. 1).

## II. LEGAL STANDARDS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (citing *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)); *see also* 42 U.S.C. § 405(g). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Although a court must meticulously review the entire record, it "may neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *See, e.g.*, *id.* (quotation marks and citation omitted).

2

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is "not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154 (quotation omitted); "if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted); or if it "constitutes mere conclusion[,]" *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the record as a whole, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262 (citation omitted). While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (citation omitted), and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* at 1010 (quotation omitted). "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation and citation omitted).

**B.  Disability Framework**

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20

C.F.R. § 404.1520. If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of her impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" the claimant retains sufficient RFC "to perform work in the national economy, given [her] age, education and work experience." *Grogan*, 399 F.3d at 1261 (citation omitted); *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### III.  THE ALJ'S DETERMINATION

The ALJ reviewed Plaintiff's claims pursuant to the five-step sequential evaluation process. (AR at 110-120). First, ALJ Leppala found that Plaintiff met the SSA's insured status requirements through September 30, 2023. (*Id*. at 112). He also found the Plaintiff had engaged in substantial gainful activity after the alleged onset date, from July 2018 to September 2018. (*Id.*). Even so, he determined that there was a "continuous 12-month period(s) during which [Plaintiff] did not engage in substantial gainful activity." (*Id.*). As such, he proceeded in his analysis, considering only those periods during which Plaintiff did not engage in substantial gainful activity for the remaining steps of the sequential evaluation process. (*See id*.). The ALJ then found at step two that Plaintiff suffered from non-severe disorders of the urinary tract and

digestive system. (*Id*. at 113). In addition, he found that Plaintiff had the following severe impairments: "osteoarthritis of the knees, obesity, anxiety disorder, and bipolar disorder with depressive symptoms. (*Id.*). At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met the criteria of listed impairments under Appendix 1 of the SSA's regulations. (*Id.* at 113-14).

Moving to the next step, the ALJ reviewed the evidence of record, including medical opinions and evidence from treating and consulting providers, prior administrative medical findings, and Plaintiff's own subjective symptom evidence. (*See id.* at 114-18). Having done so, the ALJ concluded that for the relevant period, Plaintiff possessed an RFC to

> perform light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b) except [she] is capable of lifting and/or carrying 20 pounds occasionally, 10 pounds frequently. She can stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday, all with normal breaks. She can understand, carry out, and remember simple instructions and make commensurate work-related decisions. She can respond appropriately to supervision, coworkers, and work situations. She can deal with routine changes in a work setting. [She] can maintain concentration, persistence and pace for up to and including two hours at a time with normal breaks throughout a normal workday. [She] is limited to simple, routine, and repetitive tasks and best suited to jobs involving working primarily with things and not people.

(*Id.* at 114-15). The ALJ determined that Plaintiff had no past relevant work. (*Id.* at 118).

Moving to step five, however, the ALJ determined that "there [were] jobs that exist in significant numbers in the national economy that Plaintiff [could] perform." (*Id.* at 119). The ALJ therefore concluded that Plaintiff's work was not precluded by her RFC and that she was not disabled from August 1, 2017, through the date of his decision. (*See id.* at 120).

## IV.  DISCUSSION

In her Motion to Remand, Plaintiff contends that the ALJ failed to properly assess the prior administrative findings of a state agency psychological consultant (*see* Doc. 18 at 12-17),

that the ALJ failed to consider or discuss her non-severe impairments in formulating the RFC (*see id.* at 17-25), and that the ALJ's authority over this matter is unconstitutional under *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020) (*see id*. at 25-26). In her Reply brief, Plaintiff states that she "respectively concedes her argument that the ALJ lacked the authority to adjudicate her claim pursuant to *Seila Law LLC . . . .*" (Doc. 23 at 1). As such, the Court will deny Plaintiff's motion as to her constitutional claim. As to her remaining claims, the Court finds no reversible error in the ALJ's evaluation of the state agency psychological consultant's opinions but concludes that the ALJ's inadequate evaluation of her non-severe impairments warrants remand.

### A.   Evaluation of Dr. King's Opinions

In her first claim, Plaintiff contends that the ALJ failed to properly assess the findings of Edith King, Ph.D., a state agency psychological consultant. (Doc. 18 at 12-17). Because Plaintiff applied for disability benefits after March 27, 2017, the ALJ was required to evaluate medical opinions in her case under the revised regulations found in 20 C.F.R. §§ 404.1520c and 416.920c. *See Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533 at *4 & n.8 (10th Cir. July 6, 2021). Medical opinions from state agency consultants like Dr. King are classified as "prior administrative findings[,]" but the rules for weighing them are the same as for weighing medical opinions. *Vigil v. Saul*, No. CV 20-632 CG, 2021 WL 2117184, at *5 (D.N.M. May 25, 2021) (citing 20 C.F.R. §§ 404.1531a, 404.1520c); *see also* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c)); 20 C.F.R. § 404.1513a ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security

disability evaluation."). Under the revised regulations, no specific evidentiary weight or deference is given to medical opinions or prior administrative findings. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, they are evaluated on equal footing using the factors enumerated in the regulations. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).

The revised regulations do, however, impose "articulation requirements" on an ALJ. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b). First, "when a medical source provides multiple medical opinion(s)," the ALJ need not articulate how he considered each individual medical opinion, but he must "articulate how [he] considered the medical opinions . . . from that medical source together in a single analysis." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). Second, an ALJ must consider five factors when evaluating medical opinion evidence, *see* 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5); however, he is generally only required to articulate his consideration of two of those factors: supportability and consistency. 20 C.F.R. §§ 404. 1520c(b)(2), 416.920c(b)(2). Third and finally, if differing medical opinions or prior administrative findings are equally well-supported and consistent with the record, the ALJ must then "articulate how [he] considered the other most persuasive factors . . . [,]" including the source's relationship with their client, any specialization, and other factors that tend to support or contradict the opinion or finding. 20 C.F.R. §§ 404.1520c(b)(3), 404.1520c(c)(3)-(5), 416.920c(b)(3), 416.920c(c)(3)-(5).

While the revised regulations give the ALJ some discretion in *how* he articulates his findings as to the persuasive value of prior administrative findings, they provide no leeway as to *whether* he articulates such findings. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b) (providing that the ALJ "will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record"). In

other words, although the ALJ is generally "not required to discuss every piece of evidence," *see Clifton*, 79 F.3d at 1009-10, the duty to address the persuasive value of medical opinions and prior administrative findings is mandatory. *See id.*

The new regulations do not alter the standard of review. Thus, an ALJ's persuasiveness finding "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118 (quotation omitted), or if it "constitutes mere conclusion," *Misgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citation omitted). As before, an ALJ must "consider all relevant evidence in the case record," *Silva v. Saul*, No. 19-913 WJ/KK, 2020 WL 4220862, at *4 (D.N.M. July 23, 2020) (citing 20 C.F.R. §§ 404.1520b, 416.920b), and must provide the Court with a "sufficient basis to determine that appropriate legal principles have been followed[,]" *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation omitted).

In this case, the record contains prior administrative findings from two state agency psychological consultants. First, psychologist Richard Sorenson, Ph.D, examined the Listing of Impairment's "paragraph B" criteria for mental impairments at the initial level of review. (AR at 53). Dr. Sorenson determined that Plaintiff had mild limitations in understanding, remembering, and applying information and adapting or managing oneself; he found moderate limitations in interacting with others and concentrating, persisting, or maintaining pace. (*Id.*). Dr. Sorenson also completed a Mental Residual Functional Capacity Assessment ("MRFC") in which he concluded that Plaintiff retained the capacity to "understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." (*Id.* at 57).

The ALJ noted Dr. Sorenson's "paragraph B" findings and recited his MRFC narrative. (*Id*. at 117). He concluded that "[t]he 'paragraph B' criteria [were] supported because [Dr. Sorenson] notes that [Plaintiff] has shown some improvement with medication and continues to work in retail on a part-time basis." (*Id*. (citing AR at 48-72)). In contrast, the ALJ determined that Dr. Sorenson's "social interaction finding [was] inconsistent with the treatment records, which show [Plaintiff] still struggle[d] with interaction with others, including anxiety symptoms." (*Id*. (citing AR at 810-11)). In sum, the ALJ found Dr. Sorenson's prior administrative findings generally consistent with the record, except that the record supported *more restrictive* social limitations. (*See id*.).

The ALJ also discussed the reconsideration-level findings of Dr. King, a second state agency psychologist. (*Id*. at 117-18). Dr. King reviewed and summarized the record, including Dr. Sorenson's findings, and provided her own "paragraph B" findings and MRFC. (*See id*. at 75-90, 91-106). Dr. King's findings largely match the initial-level findings of Dr. Sorenson apart from her "paragraph B" finding in one area: concentration, persistence, and pace. (*Compare* AR at 53-57, *with* AR at 82-88). As discussed hereinafter, it is this finding that Plaintiff maintains was not properly considered by the ALJ.

Dr. King determined that Plaintiff had mild limitations in her ability to understand, remember, or apply information and to adapt and manage oneself; moderate limitations in her ability to interact with others; and marked limitations in her ability to concentrate, persist, or maintain pace. (AR at 82). As to her marked limitation finding, Dr. King reasoned: "Cognitively [Plaintiff] functions well but in terms of persistence and pace she shows limitations from fatigue as well as anxiety and mood swings. See MRFC." (*Id*. at 83, 99).

Dr. King's MRFC followed. (*See id*. at 86-88). Therein, she found Plaintiff markedly limited in her abilities "to carry out detailed instructions" and, most relevant to Plaintiff's motion, "to maintain attention and concentration for extended periods." (*See id*.) Dr. King also found Plaintiff moderately limited in various other abilities, each of which Dr. Sorenson also found moderately limited.[1] (*Compare* AR at 56-57, *with* AR at 87-88). In the narrative section of her MRFC, Dr. King attributed Plaintiff's marked limitations in concentration, persistence, and pace primarily to her "severe anxiety." (AR at 88). She observed that Plaintiff experienced "periodic mood swings" – including "some mania" and "some depression" – but she described Plaintiff's impairments as "moderate overall with reports of limited 'staying power' and limitations in concentration and persistence due to combined 'fatigue' and lapses in concentration." (*Id*.). Dr. King later clarified that despite her limitations, Plaintiff retained the capacity to "understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." (*Id*. at 88, 104). In short, she assessed the same mental RFC as Dr. Sorenson. (*Compare* AR at 57, *with* AR at 88).

The ALJ's mental RFC, in turn, largely mirrors those of the state agency consultants. He found Plaintiff was able to:

> understand, carry out, and remember simple instructions and make commensurate work-related decisions[,] . . . respond appropriately to supervision, coworkers, and work situations[,] . . . deal with routine changes in a work setting[,] . . . maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks through a normal workday.

---

[1] Dr. King found Plaintiff moderately limited in her abilities "to understand and remember detailed instructions"; "to work in coordination with or in proximity to others without being distracted by them"; "to complete a normal workday and workweek without interruptions from psychologically based symptoms"; "to perform at a consistent pace without an unreasonable number and length of rest periods"; "to interact appropriately with the general public"; "to accept instructions and respond appropriately to criticism from supervisors"; and "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (AR at 86-88).

(AR at 114-15). The ALJ's RFC went further than those of Drs. Sorenson and King, though, as he also restricted Plaintiff to "simple, routine, and repetitive tasks and . . . to jobs involving working primarily with things and not people." (*Id*. at 115).

*i. Persuasiveness Analysis of Dr. King's Prior Administrative Findings*

Still, Plaintiff asserts that the ALJ's assessment of Dr. King's prior administrative findings was inadequate. (Doc. 18 at 16-17). First, she maintains that the ALJ failed to comply with the dictates of 20 C.F.R. §§ 404.1520c(b)(1) and 416.920c(b)(1), because he neglected to specify the persuasiveness that he attributed to Dr. King's findings. (*Id*. at 16). To the extent that the ALJ did not explicitly state that Dr. King's findings were either "persuasive" or "unpersuasive," Plaintiff is correct. (*See* AR at 117-18). Instead, he offered the following analysis:

> The "paragraph B" limitations and additional [RFC] are unsupported because Dr. King only notes that [Plaintiff] is more limited in concentration, persistence, and pace due to her severe anxiety, but does not provide a further explanation. (7A; 8A). However, these findings are somewhat consistent with additional treatment records, which show that [Plaintiff] has mood swings and panic-like sensations (10F/3-4; 7F; 3F/12).

(*Id*.). Given this explanation, the Court can infer that the ALJ found that Dr. King's prior administrative findings fell somewhere on the continuum between "persuasive" and "unpersuasive." Put another way, implicit in his rationale is a finding that Dr. King's findings were *somewhat* persuasive but not *entirely* persuasive. The Court will not reverse on the basis that the ALJ failed to use the word "persuasive." However, it will hold the ALJ to the standard of articulation required under the new regulations, including some explanation as to how he considered the consistency and supportability factors for prior administrative findings. *See* 20 C.F.R. §§ 404.1520c, 416.920c. Although the regulations do not prescribe the depth at which the ALJ must discuss those factors, he must provide "sufficient specificity to enable the reviewing

court to decide whether the determination is supported by substantial evidence . . . ." *Zambrano v. Kijakazi*, No. 1:20-1356 KRS, 2022 WL 1746765, at *5 (D.N.M. May 31, 2022) (quoting *Frazer v. Kijakazi*, No. 20-1147 GBW, 2022 WL 682661, at *5 (D.N.M. Mar. 8, 2022)).

The consistency factor calls for a comparison between the prior administrative findings and "the evidence from other medical sources and nonmedical sources" in the record. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The more consistent the findings are with the other evidence, the more persuasive they will be. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). Here, the ALJ determined that Dr. King's findings were "somewhat consistent with additional treatment records, which show that [Plaintiff] has mood swings and panic-like sensations." (AR at 118). In support of his partial consistency finding, the ALJ referenced various records. (*Id*. (citing AR at 698, 764-68, 810-11)).

First, he cited a record derived from a September 2018 evaluation of Plaintiff for "mood disorder" and "[r]ule out of Bipolar disorder." (*Id*. at 810). According to the record, Plaintiff experienced "[p]revious instances of hypomania/mania including increased goal-directed behavior, racing thoughts, grandiosity" but also "[e]ndorsed symptoms of severe **depression** today, including near-daily avolition, overeating, thoughts of being a failure." (*Id*.). The medical provider "[s]uspected mixed episodes [and] possible rapid cycling." (*Id*.). Plaintiff also "[r]eported worsening **anxiety** and panic-like sensations." (*Id*.).

In addition, the ALJ referenced a record that documented a March 4, 2020 telephone encounter between Plaintiff and a medical provider, in which Plaintiff reported that she was absent from work "because her **depression** did not allow her to get to work." (AR at 811). According to the medical provider who spoke to her, Plaintiff reported increased depression, irritability, and isolation. (*Id*.). Although the record reports that Plaintiff's treating doctor offered

to increase her prescription for Lamictal, it also indicates that the doctor believed it was "fine to wait a bit and see if things improve over time." (*Id*.).

Next, the ALJ cited a September 18, 2018 progress note from Plaintiff's psychologist, Jonathan Henry, PsyD. (*Id*.) (citing AR at 698). According to that record, Plaintiff reported symptoms of mania, including racing thoughts, grandiosity, decreased need for sleep, and occasionally reckless behavior. (*Id*. at 698). Plaintiff also noted that her periods of mania were often followed by a "crash" with significant depressive symptoms. (*Id*.).

Finally, the ALJ cited an April 6, 2019 Mental Status Examination performed by consultative examiner Justin Beatty, M.D. (*Id*. at 118 (citing AR at 764-68)). Plaintiff reported periods of mania when she "gets things done, feels great, and doesn't need much sleep" as well as periods of depression when she "shuts down completely for days at a time [and] may not even come out of her room." (*Id*. at 764). According to Dr. Beatty, Plaintiff's presentation was consistent with her diagnoses of bipolar disorder and anxiety. (*Id*. at 767). He explained that although she was working 15 hours per week in retail, Plaintiff did not believe her work situation was sustainable. (*Id*.). Dr. Beatty opined that Plaintiff was "limited in her ability to work by the exhaustion and fatigue which comes from her anxiety" and noted that "her depressive periods make it difficult to even get out of bed to make it to work." (*Id*.). Nevertheless, Dr. Beatty concluded that Plaintiff's "prognosis [was] very good with appropriate treatment." (*Id*.).

The Court can surmise that the ALJ referenced the above records to confirm that Plaintiff experienced mood swings and anxiety and that some limitations in her mental functioning were consistent with the record. The ALJ himself characterized Plaintiff's anxiety disorder and bipolar disorder as severe impairments and found that they moderately limited her ability to engage in social activities, to deal with authority, and to concentrate, persist, or maintain pace. (*Id*. at 113-

14). Moreover, the ALJ assessed an RFC that limited Plaintiff to "simple, routine and repetitive tasks" and "to jobs involving working primarily with things and not people." (*Id*. at 115). Still, the ALJ's conclusion that Dr. King's findings were only *somewhat* consistent with the record begs the question: Which of Dr. King's findings did the ALJ reject as inconsistent? Plaintiff insists that the answer to this question is unclear. (Doc. 18 at 16-17). The Court, however, is satisfied that the ALJ adequately answered this question, as explained below.

With respect to the supportability factor, an ALJ must examine how well a medical source supported her own opinions with "objective medical evidence" and "supporting explanations." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her . . . prior administrative medical finding(s), the more persuasive the . . . prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Here, the ALJ described Dr. King's "'paragraph B' limitations and additional residual functional capacity" as "unsupported." (AR at 117). By this, he presumably meant that Dr. King failed to provide support, through objective medical evidence or explanation, for any additional restrictions beyond those the ALJ determined in his own RFC assessment. (*See id*. at 117 (citing AR at 75-90, 91-106)). The ALJ elaborated, explaining that "Dr. King only notes that [Plaintiff] is more limited in concentration, persistence, and pace due to her severe anxiety, but does not provide a further explanation." (*Id*. at 117-18 (citing AR at 75-106)).

Plaintiff contends that the ALJ's supportability finding is a mischaracterization of Dr. King's prior administrative findings and unsupported by substantial evidence. (Doc. 18 at 16). Plaintiff observes that in addition to finding that she was markedly limited in her ability to concentrate, persist, and maintain pace, Dr. King also summarized the relevant records, including

14

her function report, her medical records, and the prior administrative findings from the initial-consideration level. (*Id*. (citing AR at 82)). Plaintiff highlights Dr. King's finding that "[c]ognitively she functions well but in terms of persistence and pace she shows limitations from fatigue as well as anxiety and mood swings." (Doc. 18 at 16 (quoting AR at 83)). She emphasizes that Dr. King not only found that her marked limitations in concentration, persistence, and pace were "due in large part to her severe anxiety[,]" she *also* noted that Plaintiff suffered from "periodic mood swings" with both mania and depression. (*Id*.) (quoting AR at 88). In short, Plaintiff contends that Dr. King did *more* than merely "note" marked limitations in concentration, persistence, and pace; contrary to the ALJ's finding, she insists that Dr. King offered "further explanation." (*Id*.).

In the Court's view, Plaintiff misconstrues the ALJ's finding. As the Court understands the ALJ's rationale, his issue with Dr. King's explanation relates to her failure to explain the omission from her own RFC of functional limitations to account for *marked* limitations in concentration, persistence, and pace. Significantly, Dr. King herself ultimately determined that Plaintiff retained the mental RFC to attend and concentrate for two hours at a time. (*See* AR at 88). However, she did so without specifying what, if any, work-related functional limitations resulted from Plaintiff's marked limitations in concentration, persistence, and pace. In other words, she failed to offer "further explanation" for her "paragraph B" findings and mental RFC, just as the ALJ found. (*See id*. at 117). Although the ALJ could have more clearly articulated his analysis in this regard, the Court is satisfied that it can follow the ALJ's reasoning and agrees with the Commissioner that the ALJ adequately evaluated Dr. King's prior administrative findings. Still, because the Court reverses on independent grounds, it advises the ALJ on remand

to flesh out and more clearly articulate his analysis of the persuasive value of Dr. King's opinions.

*ii. Failure to Incorporate Marked Limitations into RFC*

Plaintiff makes an additional, but related argument. She asserts that the ALJ erroneously failed to incorporate into his RFC Dr. King's *marked* limitations in concentration, persistence, and pace. (Doc. 23 at 5). Drawing upon the rationale of the Honorable Stephan M. Vidmar in *Vanderpool v. Saul*, No. 20-cv-0301 SMV, 2021 WL 2117182 (D.N.M. May 25, 2021), Plaintiff maintains that if the ALJ had adopted Dr. King's marked limitation finding, he would have found a more restrictive RFC and determined that Plaintiff could not meet the basic mental demands of unskilled work. (*Id*. at 5-6). According to Plaintiff, Dr. King's findings were "significant, probative evidence that [the ALJ] was required to discuss in order for substantial evidence to support [his] findings." (Doc. 18 at 17 (quoting *Vigil*, 2021 WL 2117184)). At first blush, Plaintiff's position has some appeal. After all, Dr. King found marked limitations in concentration, persistence, and pace and yet, she determined that Plaintiff retained the capacity to maintain concentration, persistence, and pace for up to and including two hours at a time. At the very least, the ALJ must explain why he rejected the probative findings of Dr. King.

Having examined the whole of the ALJ's decision, though, the Court is satisfied that the ALJ unequivocally rejected the "paragraph B" *marked* limitations that Dr. King assessed in concentration, persistence and pace and that he offered adequate reasons for doing so. The ALJ emphasized that Dr. King's *marked* limitations in concentration, persistence, and pace went further than the *moderate* limitations Dr. Sorenson found in this same area on initial review. (*See* AR at 117 (noting that Dr. King "found that [Plaintiff] has similar limitations as in the initial level, but also that she has limitations in concentration, persistence, and pace due to her severe

anxiety")). The ALJ also explained that he favored Dr. Sorenson's finding because Plaintiff "has shown some improvement with medication and continues to work in retail on a part-time basis." (*Id*. (citing AR at 48-72)).

In addition, the ALJ explained why he found that the record supported *moderate* limitations in concentration, persistence, and pace. (*See id*. at 114 (finding moderate limitations in the area of concentrating, persisting, or maintaining pace and noting that Plaintiff was "able to prepare meals and watch television[,]" and showed "appropriate concentration and attention" on exam) (citing AR at 11-45, 279-86, 764-68)); (*see also id*. at 117 (describing Dr. Sorenson's moderate limitation in concentrating, persisting, or maintaining pace as "supported because . . . [Plaintiff] has shown some improvement with medication and continues to work in retail on a part-time basis")). Further, as the Commissioner observes, the ALJ's RFC incorporated *all* of the functional limitations that Dr. King included in her own mental RFC. (Doc. 22 at 18). The Court finds no reversible error in the ALJ's treatment of Dr. King's prior administrative findings and will deny Plaintiff's motion as to this claim.

### B.  Evaluation of Plaintiff's Urinary and Digestive Impairments.

Next, Plaintiff asserts that the ALJ erroneously failed to consider and discuss her urinary and digestive impairments at step four and that his step-two analysis of these impairments fails to cure his step-four error. (Doc. 18 at 18-19). The Commissioner, in contrast, insists that the ALJ's RFC finding shows sufficient consideration of each of Plaintiff's medically-determinable impairments, including Plaintiff's urinary and digestive impairments. (Doc. 22 at 18).

"At step two, an ALJ must consider whether an impairment is severe." *Lopez v. Berryhill*, No. CV 16-552 SCY, 2017 WL 4356384, at *3 (D.N.M. Sept. 30, 2017) (citing *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016) (citing 20 C.F.R. § 416.920(a)(4)(ii))). "An impairment or

combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). The ALJ considered Plaintiff's kidney and gastrointestinal problems collectively as "disorders of the urinary tract and digestive system." (*See* AR at 113).  He determined that these impairments were non-severe, offering three observations in support. (*Id*.). First, he emphasized that Plaintiff "has diverticulosis without diverticulitis." (*Id*. (citing AR at 884)). Second, he noted that Plaintiff's "physical exams have been normal except for some acute episodes." (*Id*. (citing AR at 848, 884)). Third, he observed that Plaintiff "reported that her pain improved with medications." (*Id*. (citing AR at 848, 884)). Plaintiff maintains that the ALJ's analysis is "not supported by substantial evidence and contains harmful legal error." (Doc. 18 at 19).

When an ALJ determines that impairments are non-severe at step two, he must still "consider them when formulating her RFC, if warranted by the record." *Lopez v. Berryhill*, No. CV 16-0638 KBM, 2017 WL 2799293, at *5 (D.N.M. May 31, 2017). But, here, the ALJ's only discussion of Plaintiff's urinary and digestive impairments was at step two of his analysis; thus, the Court begins there.

First, Plaintiff contends that the ALJ mischaracterized the record when he stated that she had "diverticulosis without diverticulitis." (Doc. 18 at 19 (citing AR at 113)). Diverticulosis occurs "when pockets called diverticula form in the walls of [a person's] digestive tract." *What is Diverticulosis?*, WebMD, https://www.webmd.com/digestive-disorders/what-is-diverticulosis (last visited June 29, 2022). With diverticulosis, there are often no symptoms. *Id*. Diverticulitis, on the other hand, occurs when "one or more of the pockets gets inflamed or infected" and "can cause severe pain in [a person's] belly." *Id*. Although the ALJ did not explain how Plaintiff's diagnosis of "diverticulosis without diverticulitis" bolstered his non-severe rating, the Court

infers that absent accompanying diverticulitis, the ALJ did not consider Plaintiff's condition to significantly impact her ability to work.

Plaintiff, however, points to a September 4, 2018 record, which she asserts establishes that she was also diagnosed *with diverticulitis*. (Doc. 18 at 19 (citing AR at 885)). The referenced progress note from CNP Deborah Lee Pearson reports that Plaintiff presented with abdominal pain following a recent visit to the emergency department due to "epigastric and generalized abdominal pain." (AR at 884). Although CNP Pearson acknowledged that a CT showed diverticulosis *without* diverticulitis, she also noted a "history of diverticulitis." (*Id*.). CNP Pearson reported that Plaintiff had been "unable to complete the colonoscopy due to inflammation of diverticulosis" and that, on physical examination, Plaintiff reported tenderness in her abdomen. (*Id*. at 884-85). CNP Pearson assessed "[d]iverticulitis of the colon" and instructed Plaintiff to follow up with her gastrointestinal physician and to re-schedule her colonoscopy. (*Id*. at 886); (*see also id*. at 413 (noting history of diverticulitis in October 2017)).

The Court agrees with Plaintiff that, contrary to the ALJ's step-two finding, the September 4, 2018 record shows that CNP Pearson assessed diverticulitis. (*See id*. at 884-86). Moreover, as discussed below, the record illustrates that Plaintiff frequently complained of severe abdominal pain, which is a symptom of diverticulitis. *See What is Diverticulosis?*, WebMD, https://www.webmd.com/digestive-disorders/what-is-diverticulosis. The same record indicates that Plaintiff was unable to complete a colonoscopy due to inflammation, another symptom of diverticulitis. Given these contradictions between the record and the ALJ's finding that Plaintiff was diagnosed with "diverticulosis without diverticulitis," the Court cannot conclude that the ALJ's step-two determination was supported by substantial evidence; nor can it follow the ALJ's reasoning.

Second, Plaintiff argues that the ALJ erroneously determined that her physical exams were "normal, except for some acute episodes." (Doc. 18 at 19). Plaintiff relies principally upon a previous decision by this Court: *Fernandez v. Saul*, Civ. No. 1:18-CV-00633-KRS, 2019 WL 4565195 (D.N.M. Sept. 20, 2019). (*See id.*). In *Fernandez*, this Court determined that the ALJ failed to adhere to the applicable regulations in evaluating the claimant's pain and related limitations. *Fernandez*, 2019 WL 4565195, at *3. The ALJ there "us[ed] only those 'portions of evidence favorable to his position,' while excluding significantly probative evidence without explanation." *Id*. (quotation and citation omitted). He failed to explain how normal examination findings, such as normal motor strength and joint movement, undermined the claimant's allegations and a medical source's opinions. *Id*. at *3-4. Moreover, he erroneously referenced normal examination findings "without any link to [the claimant's] symptoms or explanation of their probative value." *Id*. at *4 (citing *Praytor v. Comm'r, SSA*, 750 F. App'x 723, 727 (10th Cir. 2018)). The Court could not follow the ALJ's reasoning and determined that his findings were not supported by substantial evidence. *Id*.

Here, the ALJ cites only two records to support his finding that Plaintiff's physical examination were "normal except for some acute episodes." (AR at 113 (citing AR at 848, 884)). The Court's examination of these records reveals that the ALJ's citation is an apparent attempt to illustrate Plaintiff's so-called "acute episodes," rather than to provide examples of her normal physical examinations. First, the ALJ references a June 7, 2019 record from CNP Kimberlee Elizabeth Tafoya, in which Plaintiff reported moderate aching and sharp abdominal pain in the left lower quadrant "relieved by nothing." (*Id*. at 846). The record indicated that Plaintiff was positive for diverticulitis and kidney stones. (*Id*. at 847). According to that record, Plaintiff's pain improved only following administration of Toradol in the clinic, and Plaintiff was assessed

with abdominal pain not otherwise specified, personal history of kidney stones, hematuria[2] not otherwise specified, and urinary tract infection not otherwise specified. (*Id*. at 847-48). CNP Tafoya indicated that she "discussed differential doses [sic] of diverticulitis/kidney stone with the patient." (*Id*. at 848). Next, the ALJ cited the previously-discussed September 4, 2018 progress notes from CNP Pearson in which Plaintiff was assessed with diverticulitis. (*See id*. at 113 (citing AR at 884-85)). Taken together, Plaintiff insists that these records suggest that neither her examinations nor the objective evidence were "normal." (Doc. 18 at 20 (citing AR at 113)). The Court agrees. Plaintiff further asserts that "[o]ther records in the file also reveal abnormal examinations." (*Id*.). Again, the Court agrees.

Plaintiff contends that the ALJ "ignored specific medical facts, including CTs, operative reports, and physical examination and nonmedical facts like her complaints of pain." (Doc. 18 at 23). She offers more than 20 bullet points summarizing entries from her medical records from June 2018 to March 2020, each of which refers to abdominal pain or pain medication taken to address such pain. (*See id*. at 23-24). The only "normal" physical findings to which the ALJ specifically refers in his decision are negative straight leg tests and normal sensations, reflexes, and motor strength. (*Id*. at 116 (citing AR at 756-63, 769-77, 816, 856, 858, 860, 865)); (*see also id*. 118 (citing same)). However, these normal findings, related primarily to Plaintiff's knees, do not bear upon her limitations due to urinary and digestive impairments. By omitting discussion of the numerous records documenting Plaintiff's abdominal pain, the ALJ engaged in impermissible "cherry-picking." Simply, his step-two finding that Plaintiff's physical examinations were "normal, except for some acute episodes" is not supported by substantial

---

[2] Hematuria, or blood in the urine, can come from the kidneys, ureters, bladder, or urethra and can be a symptom of bladder infection, kidney infection, kidney stones, kidney cancer, or kidney disease. *See Blood in Urine (Hematuria)*, WebMD, https://www.webmd.com/digestive-disorders/blood-in-urine-causes (last visited June 29, 2022).

evidence. As in *Fernandez*, the ALJ failed to explain how the referenced normal physical examination findings supported his determination that Plaintiff's urinary and digestive impairments are non-severe or that they failed to result in functional limitations.

As to the ALJ's third observation, Plaintiff contends that the ALJ's statement that Plaintiff "reported that her pain improved with medications" is "misleading." (Doc. 18 at 20). The ALJ cited two records in support of this finding. (*See* AR at 113 (citing AR at 848, 884)). The most recent record, from June 7, 2019, discusses an improvement in Plaintiff's abdominal pain, but only after she received an injection of Toradol in the clinic. (Doc. 18 at 20 (citing AR at 848)). Plaintiff explains that Toradol is a "'short-term' injectable pain reliever" that is not recommended for use longer than five days. (*Id*. (quoting MedlinePlus, *Ketorolac Injection*, available at https://medlineplus.gov)). Further, Plaintiff references a subsequent record, which reveals that the day following her Toradol injection, she called to report that she was experiencing "continued pain after [T]oradol wore off" and that Ibuprofen was not effective. (*Id*. (citing AR at 846)).

In the second record cited by the ALJ, CNP Pearson reported on September 4, 2018, that Plaintiff was "given Tramadol x 10 pills" in the emergency department and finished all of them. (AR at 884). At that time, Plaintiff rated her pain at a five out of ten, but she indicated that her pain was usually a seven out of ten. (*Id*.). Critically, the record goes on to provide that CNP Pearson advised Plaintiff that she would "not be refilling Tramadol prescription" over concerns regarding long-term opiate use. (*Id*. at 885). Plaintiff submits that the ALJ's finding – that her pain improved with medications – was misleading and not supported by substantial evidence. Moreover, she asserts that other evidence in the record, evidence not discussed by the ALJ,

demonstrates that she could not control her abdominal pain with medication. (Doc. 18 at 20-21 (citing Doc. 18 at 23-24)).

The Court agrees with Plaintiff that the ALJ's failure to discuss the circumstances under which her abdominal pain resolved – circumstances that could not be replicated for the long-term – provides a misleading account of the severity of her urinary and digestive impairments. More specifically, because the referenced records suggest that Plaintiff was unable to obtain Toradol or Tramadol on an ongoing basis to treat her abdominal pain, the ALJ's finding was not supported by substantial evidence. Although the ALJ may have inferred from Plaintiff's treatment records that certain digestive impairments (e.g., kidney stones) for which she required pain medication eventually resolved, he fails to say as much. And, notably, Plaintiff testified that she had a painful kidney stone even at the time of her hearing before the ALJ. (AR at 26). The Court will not uphold the ALJ's findings on the basis of speculation.

In sum, none of the reasons the ALJ offered for his step-two non-severity finding withstands scrutiny. As such, the ALJ's step-two discussion on its own is an inadequate substitute for addressing those impairments at step four. (*See id.*) Beyond his misleading and erroneous observations, the ALJ proclaimed, in conclusory fashion, that he "considered all of [Plaintiff's] medically determinable impairments, including those that [were] not severe, when assessing [her] residual functional capacity [at step four]." (AR at 113). Plaintiff insists that this "boilerplate statement" fails to suffice. (Doc. 18 at 21). The Court typically takes an ALJ at his word when he states that he considered impairments. *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) ("Where, as here, the ALJ indicates he has considered all the evidence our practice is to take the ALJ at his word.") (quotation marks and brackets omitted). But, here, the

ALJ's inadequate rationale at step two leaves the Court without confidence that the ALJ properly considered those same impairments at step four. Indeed, his analysis suggests that he did not.

Although the ALJ purported to consider each of Plaintiff's medically-determinable impairments at step four, he did not mention or allude to her urinary or digestive impairments. In his discussion of Plaintiff's "physical impairments," he discussed Plaintiff's knee problems and obesity, both of which he characterized as "severe" impairments at step two. (*See* AR at 113, 116-18). He specifically noted, for instance, Plaintiff's range of motion, her motor strength, and pain in her knees. (*See id*. at 118). Despite the bulk of medical records referencing Plaintiff's urinary and digestive impairments, there is no mention of these disorders or probative evidence related to them found in step four of the ALJ's analysis. (*Compare* AR 118, *with* AR at 358-1288). Given the ALJ's faulty, unsupported analysis at step two, more was required. *See Wells v. Colvin*, 727 F.3d 1061, 1069-71 (10th Cir. 2013) (concluding that a separate discussion of the claimant's mental impairments elsewhere in the ALJ's decision "might have satisfied the ALJ's obligation at step four" if that discussion had not been beset with legal errors). Ultimately, the Court concludes that the ALJ failed to adequately address Plaintiff's non-severe impairments in assessing the RFC. *See Wells*, 727 F.3d at 1065 ("in assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, whether severe or not severe") (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)).

The more difficult question is whether the ALJ's erroneous treatment of Plaintiff's urinary and digestive impairments was harmful. To be sure, the ALJ did not explicitly hold that limitations from Plaintiff's urinary and digestive impairments were accommodated by the RFC. Instead, he offered only a conclusory reassurance that he considered those impairments when assessing her RFC. Still, the Commissioner maintains that reversal is not required, because

Plaintiff has not identified additional limitations that were ignored by the ALJ. (Doc. 22 at 20 (citing Doc. 18 at 18-25; 20 C.F.R. § 404.1512(a); *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004))).

Plaintiff first argues that the ALJ's error was harmful because the record demonstrates that she required access to the restroom five times every four hours, and the vocational expert testified that such a limitation would not be tolerated by employers. (*See* Doc. 18 at 24-25). Plaintiff submits that this frequent-restroom-use limitation was supported by her "nausea, screaming pain during urination, and diarrhea." (*Id*. at 25 (citing AR at 375, 391, 398, 401, 413-15, 432-34)). The Commissioner maintains that Plaintiff's argument is misleading, noting that Plaintiff testified that her frequent trips to the restroom were necessitated by her anxiety and bi-polar disorder, not by any physical impairments.[3] (Doc. 22 at 20 n.4 (citing AR at 19, 23)). Plaintiff concedes this point but nevertheless suggests that "the connection between her non-severe impairments and using the restroom is undeniable." (Doc. 23 at 8 n.4). The Court observes that there is some suggestion in the record of possible interplay between Plaintiff's abdominal pain and her anxiety. (*See* AR at 391 (Plaintiff explaining that she did not know whether her flank pain and nausea were related to anxiety)). Even so, the Court is not entirely persuaded by this argument alone.

Plaintiff also asserts that pain from her urinary and digestive impairments would cause her to be off-task more than 15 percent of the workday or to be absent more than two days per month. (Doc. 18 at 25 (citing AR at 39)). Plaintiff references testimony from the vocational expert to the effect that these limitations would generally not be tolerated by an employer. (AR at

---

[3] Plaintiff testified that when she suffers from anxiety, she gets overwhelmed and "ha[s] to run off and go into the bathroom." (AR at 23). She estimated that when she has one of these episodes, she goes to the bathroom approximately five times per part-time workday. (*Id*.)

39). Plaintiff also finds support in her treatment records, wherein she informed her medical providers that she had not been able to work due to severe (10/10) flank pain from a kidney stone and epigastric pain. (Doc. 18 at 25 (citing AR 406-08)).

The Commissioner submits that Plaintiff's testimony at the administrative hearing focused on her mental impairments and that she did not identify physical impairments as a reason she was unable to work. (Doc. 22 at 20.) The Commissioner concedes that "[l]ater in the hearing" Plaintiff discussed her kidney stones; however, she observes that Plaintiff did not directly testify that her kidney stones prevented her from working. (*Id*. (citing AR at 26)). But Plaintiff *did* testify that she initially applied for disability due to back-to-back surgeries necessitated by kidney stones.[4] (*See* AR at 26). Moreover, in her original disability report, she identified kidney disease, stomach problems, fibroids, diverticulosis, and kidney stones as conditions that limited her ability to work. (*Id*. at 270). Plaintiff's medical records also provide support for the notion that pain from kidney stones, which she at times rated as 10 out of 10, left her unable to work. (*See, e.g*., *id*. at 407).

Because incorporation of the limitations asserted by Plaintiff and which find some support in the record would result in a more restrictive RFC, the Court concludes that the ALJ's error is harmful and requires reversal. On remand, the ALJ should determine, following proper consideration of Plaintiff's urinary and digestive impairments, whether the RFC should include limitations related to Plaintiff's frequent use of the restroom, being off-task, and/or being absent from work. The Court will grant Plaintiff's motion on this claim.

---

[4] According to Plaintiff, she underwent surgery to "blast" kidney stones and to have a "splint [sic]" inserted into her bladder. (AR at 26). Additionally, she explains that she also underwent another surgery to have the lining of her uterus scraped for fibro cysts. (*Id*.).

## V.  CONCLUSION

The ALJ erred in his review of Plaintiff's application for disability insurance benefits and supplemental security income by failing to adequately evaluate her non-severe impairments in accordance with controlling legal standards. Accordingly, Plaintiff's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 18) is **GRANTED**, and the Court remands this case back to the SSA for proceedings consistent with this opinion

**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**